UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| ANTWAUN FORD, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 4:12CV538 TIA |
|  | ) |  |
| CAROLYN W. COLVIN, | ) |  |
| ACTING COMMISSIONER OF | ) |  |
| SOCIAL SECURITY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Child's Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On March 19, 2009, Plaintiff filed applications for Child's Insurance Benefits and Supplemental Security Income. (Tr. 121-30) In his applications, Plaintiff alleged that he became disabled on December 3, 1990, prior to the age of 22, due to back injury, obesity, muscle spasms, and hearing voices. (Tr. 49, 121, 124) The applications were denied on July 29, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 46-56) On May 4, 2010, Plaintiff testified at a hearing before the ALJ. (Tr. 27-45) In a decision dated August 23, 2010, the ALJ found that Plaintiff had not been under a disability from December 3, 1990 through the date of the decision. (Tr. 12-23) The Appeals Council denied Plaintiff's

request for review on February 22, 2012. (Tr. 1-3) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. The ALJ first questioned the Plaintiff, who testified that he was 27 years old with a 10th grade education. He previously worked at Sonic, Taco Bell, Chili's, and a temp agency. However, none of these jobs lasted six months or longer. Plaintiff further testified that he had a previous conviction for marijuana possession and was still on unsupervised probation. (Tr. 29-31)

According to Plaintiff, he was unable to work due to his weight, which was 487 pounds the last time he was weighed. He also had problems with spasms and with his thyroid, but he did not take any thyroid medication. Plaintiff experienced sleep problems, and his doctors recommended that he undergo a sleep study. However, Plaintiff did not have Medicaid or insurance to cover the test. Plaintiff also had high blood pressure but did not take medication or regularly check his blood pressure. The ALJ advised Plaintiff to talk to his attorney about finding treatment. In addition, Plaintiff testified that he had mental problems. Specifically, Plaintiff became easily agitated and heard spirits talking to him, saying that he was worth nothing in life. (Tr. 31-35)

Plaintiff's attorney also questioned the Plaintiff, who stated that he had difficulty walking even a block. He became very tired and experienced pain in his legs, knees, and feet. In addition, he had problems with balance. Plaintiff stated that he needed to rock back and forth because of the pain. Plaintiff was engaged to be married, and his fiancee worked as a security guard from 2:00 p.m. to 11:00 p.m. While she was working, Plaintiff went over to his mother's house

2

because he was too paranoid to stay home alone with the spirits talking to him. In addition, he was unable to do household chores such as cleaning and cooking without his fiancee. Plaintiff testified that he had crying spells every night for about an hour or two before he went to bed. Plaintiff's fiancee did all of the grocery shopping. (Tr. 35-38)

Plaintiff further stated that he could not read or do math very well. He was able to make change. He could write a little more than his name, phone number, and address. Plaintiff testified that he attended self-contained special education classes in school. He attended classes with four or five students and two or three teachers. He believed he was held back one year. Plaintiff never attended vocational rehabilitation or a work training program after completing 10 years of school. (Tr. 38-40)

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE to assume a hypothetical claimant, aged 26 at the alleged onset date, with 10 years of education and no past relevant work. The individual could lift and carry 10 pounds occasionally and frequently; stand and walk for two hours in an eight-hour work day; sit for six hours; occasionally climb stairs and ramps; never climb ropes, ladders, and scaffolds; occasionally balance, stoop, kneel, and crouch; and avoid exposure to hazards of unprotected heights and concentrated exposure to moving and dangerous machinery. Additionally, the person could understand, remember, and carry out at least simple verbal instructions in non-detailed tasks and should not work in a setting that requires constant or regular contact with the general public. In light of these restrictions, the VE stated that this hypothetical person could work as an order clerk and a stuffer, which were both sedentary and unskilled. An order clerk would take an order and push a button at a business such as McDonald's. (Tr. 41-42)

3

Plaintiff's attorney also questioned the VE regarding a Wechsler individual achievement test that Plaintiff took at age 13, showing that Plaintiff read at the second grade, eighth month level. If the test had been performed recently with the same results, Plaintiff would not be able to read at a level proficient enough to perform jobs requiring reading. (Tr. 42-44)

Plaintiff completed a Function Report – Adult on May 19, 2009. During the day, Plaintiff woke up, and his fiancee helped him bathe and get dressed. She dropped him off at his mother's home when she went to work. After his fiancee picked him up, she cooked dinner, and then they watched TV. However, Plaintiff could not sit for very long, so his fiancee would help him to bed. Prior to his condition, Plaintiff was able to play basketball, drive, see movies, and partially able to enjoy life. Plaintiff could not sleep through the night due to pain, and he needed help with his personal care. He never prepared meals; however, he tried to wash and iron his own clothes. Plaintiff stated that he enjoyed watching TV and listening to music. He no longer played sports. Plaintiff further reported that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, stair climb, remember, complete tasks, concentrate, understand, follow instructions, use hands, and get along with others. He opined that he could walk five feet before needing to rest for at least three minutes to let his muscles relax and catch his breath. He could pay attention for a few minutes, and he could follow instructions when read to him. He did not get along with others because he believed they were all against him. Additionally, he heard voices and thought spirits were coming to get him. (Tr. 230-37)

In a Work History Report, Plaintiff indicated that he previously worked as a crew member at Sonic; a utility worker at Taco Bell; a dishwasher at Melting Pot; a crew member at Penn Station; a temporary production worker at Kelly Services, Express Personnel, and Aerotek; and a

4

linen deliverer at Denman Linen Company. Plaintiff only worked a few months at each job. He indicated that he could not maintain employment due to back and leg pain. (Tr. 222-29)

Plaintiff's fiancee, Chantal Pride, also completed a Function Report Adult – Third Party on behalf of Plaintiff. She stated that she helped him with his personal care and reminded him to bathe and wash his clothes. Before his muscle spasms and lack of concentration, Plaintiff was able to cook his own meals. Plaintiff could wash and iron his own clothes. Ms. Pride noted that Plaintiff's condition had worsened since hearing voices more. He went to his mother's home everyday but did not do anything. Plaintiff's conditions affected almost all of his abilities. Ms. Pride specified that, between the obesity, muscle spasms, and voices, Plaintiff could barely do anything. (Tr. 213-21)

### III. Medical Evidence

On November 11, 1990, the Special School District diagnosed Plaintiff with a learning disability in reading, math, and written expression. He was placed in a self-contained learning environment in October of 1993, and his most recent reevaluation forms indicated that he received homebound instruction and had not attended school since second semester of 1999. (Tr. 274-85) A Wechsler Individual Achievement Test administered in 1996 revealed that Plaintiff was in the 1.0 percentile in reading; the 0.4 percentile in math; and the 1.0 percentile in writing composite. (Tr. 201) An evaluation of language fundamentals showed that the total language score fell within the mild disorder range. However, the score was commensurate with Plaintiff's IQ and would not be considered a disability. (Tr. 202) A Learning Behaviors Report completed in 1996 showed deficits in listening, remembering, reasoning, reading, writing, math, comprehension, and oral expression. (Tr. 203-06)

5

Plaintiff presented to Christian Hospital on August 24, 2004 for complaints of chest pain. A consultation report revealed that Plaintiff was in good health before experiencing persistent pain in his chest. He was active and worked in a factory. He reported smoking a pack of cigarettes a day and smoking marijuana. He denied excess alcohol intake. His weight was 350 pounds. Antonio R. Penilla, M.D., assessed atypical chest pain, probably musculoskeletal, and morbid obesity. (Tr. 363-69)

On July 26, 2007, Plaintiff was seen at the SSM DePaul Emergency Room. He became angry the night before and punched a sign post. Plaintiff complained of acute pain in his right dominant hand. The treating physician assessed boxer's fracture and ordered Plaintiff to wear the splint at all times and to follow up with his doctor. (Tr. 409-13)

Plaintiff underwent a consultative examination with Inna Park, M.D., on July 15, 2009. Plaintiff's chief complaints were back pain, morbid obesity, and hypertension. Plaintiff reported increasing back pain at the age of 13, when he gained a large amount of weight. He had not received any medical treatment for pain relief. Plaintiff's weight on the date of examination was 484 pounds. Physical exam revealed tenderness along the mid-thoracic spine with a couple of areas of focal muscular spasm in the peri-scapular area. He was markedly obese but was able to get on and off the exam table carefully. He exhibited a wide-based station and gait, which was waddling in that manner. Plaintiff could stand momentarily on his toes and heels but complained of pain in his knees. He was unable to heel-toe walk a few steps, and he could only squat 20%. Dr. Park assessed morbid obesity with lumbago, gait abnormality; and hypertension, currently untreated. (Tr. 424-26)

On that same date, Summer D. Johnson, Psy.D., performed a psychological evaluation. Plaintiff complained of hearing voices and depression. He stated that the voice made him feel he was less than a man and told him he could not do certain things. Mental status exam revealed a pessimistic attitude and flat facial expression. Motor activity, posture, and gait were within normal limits. Plaintiff was coherent, relevant, and logical, with good cooperation. His receptive and expressive language skills were intact, and his mood was depressed with flat affect. Dr. Johnson also noted that Plaintiff's insight and judgment were fair. Although Plaintiff reported that he could not complete household activities or walk about five feet at a time, Dr. Johnson observed that Plaintiff walked about 20 feet with minimal difficulty. Dr. Johnson assessed major depressive disorder, single episode, severe with psychotic features; severe obesity, muscle spasms, and costochondritis; and a Global Assessment Functioning ("GAF") of 50[1]. Dr. Johnson further noted that Plaintiff felt discriminated against when seeking employment due to his size. His prognosis was good with appropriate intervention. (Tr. 431-35)

On July 29, 2009, Kyle DeVore, Ph.D., completed a Psychiatric Review Technique. Dr. DeVore indicated that Plaintiff had an affective disorder which caused mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Based on prior medical records and Plaintiff's own report, Dr. DeVore found that Plaintiff's report was partially credible and that Plaintiff remained capable of simple work tasks with limited social interaction. Dr. DeVore also completed a Mental Residual Functional Capacity Assessment, noting that Plaintiff was

---

[1] A GAF of 41 to 50 indicates "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." <u>Diagnostic and Statistical Manual of Mental Disorders</u> (<u>DSM-IV-TR</u>) 34 (4th ed. 2000).

7

moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. Dr. DeVore reiterated that Plaintiff was capable of performing simple, repetitive tasks in a limited social environment to further reduce stress. (Tr. 437-450)

Also on July 29, 2009, Geraldine Boeger, a Single Decisionmaker, completed a Physical Residual Functional Capacity Assessment. Ms. Boeger indicated that Plaintiff could lift and/or carry 10 pounds occasionally and frequently; stand and/or walk at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull in an unlimited capacity. He could only occasionally climb ramp/stairs and never climb ladder/rope/scaffolds. Ms. Boeger found Plaintiff only partially credible. (Tr. 451-57)

Plaintiff presented to the emergency department at Northwest Healthcare on March 11, 2010 for complaints of pain in both legs after working out at the gym. The attending physician diagnosed muscle pain and spasms and prescribed Naprosyn. (Tr. 500-09)

On August 2, 2010, Plaintiff was admitted to St. Mary's Health Center for a mental health evaluation. Plaintiff reported feeling depressed and hearing voices that told him to hurt himself and others. He denied suicidal or homicidal ideation at the time of his admission. Plaintiff did not

8

have a mental illness diagnosis, nor did he take medications. Plaintiff's initial diagnosis was most likely major depressive disorder, recurrent with psychosis; obesity; poor coping skills, relationship problems, financial difficulties, and problems finding a job; and a GAF of 20. Upon discharge on August 6, 2010, Plaintiff's GAF was 52[2], and his condition was fair. His prognosis was questionable and depended on community support, medications management, and psychotherapy. (Tr. 518-85)

## IV.  The ALJ's Determination

In a decision dated August 23, 2010, the ALJ found that Plaintiff had not attained the age of 22 as of his alleged onset date of December 3, 1990. Further, Plaintiff had not engaged in substantial gainful activity since December 3, 1990. The ALJ determined that Plaintiff had major depressive disorder with psychotic features, limited reading skills, and morbid obesity. However, he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-15)

After carefully considering the record, the ALJ found that Plaintiff's physical impairments precluded lifting and carrying more than ten pounds frequently and/or occasionally; standing and/or walking more than two hours in an eight-hour workday; sitting more than six hours in an eight-hour workday; more than occasional climbing of ramps and stairs; more than occasional balancing, stooping, kneeling, crouching, and crawling; and any climbing of ropes, ladders, and scaffolds. In addition, the ALJ noted that Plaintiff should avoid all exposure to the hazard of unprotected heights and concentrated exposure to the hazard of moving and dangerous

---

[2] A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning . . . ." DSM-IV-TR 34.

9

machinery. Further, he should not work in a setting which requires constant/regular contact with the general public. The ALJ found that Plaintiff could understand, remember, and carry out at least simple verbal instructions and non-detailed tasks. However, the ALJ determined that the record did not support Plaintiff's allegations of disabling limitations of function. While Plaintiff was unable to perform any past relevant work, his younger age, limited education, work experience, and residual functional capacity ("RFC") indicated that jobs existed in significant numbers in the national economy which Plaintiff could perform. Thus, the ALJ concluded that Plaintiff had not been under a disability from December 3, 1990 through the date of the decision. (Tr. 15-23)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments

listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and

set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[3] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in his Brief in Support of the Complaint. First, he asserts that the ALJ failed to properly consider all of Plaintiff's medically determinable impairments and failed to point to some medical evidence to support the RFC finding. Next, Plaintiff contends that the VE's testimony does not constitute substantial evidence because the hypothetical question does not capture the concrete consequences of Plaintiff's impairment. The Defendant maintains that substantial evidence supports the ALJ's RFC determination and that the ALJ properly included the limitations he found credible in the hypothetical posed to the VE. The undersigned

---

[3] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

12

finds that the ALJ erred in his RFC assessment and that the case should be remanded for further review.

Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present).

The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Tinervia v. Astrue, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); see also Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that

medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' . . . ."). In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). The ALJ may not rely upon his or her own inferences. Id. at 858.

Here, Plaintiff correctly notes that, in making the RFC determination, the ALJ fails to support his findings with specific medical evidence. Indeed, the RFC finding sets forth several specific limitations, yet the opinion contains no discussion of how the medical evidence supports each limitation. Further, none of the examining physicians addressed Plaintiff's ability to function in the workplace. Instead, the ALJ relies primarily on the assessment of a non-examining state agency psychologist to determine Plaintiff's capabilities in the work place, crediting Dr. DeVore's opinion that Plaintiff was only partially credible and was capable of simple work tasks with limited social interaction. (Tr. 19, 447) "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004). But "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir.2002). The SSA regulations recognize "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3).

14

In the instant case, Dr. DeVore, the non-examining source, stated that Plaintiff was only partially credible. He also gave little weight to Dr. Johnson's conclusions. As stated above, however, this opinion does not constitute substantial evidence. Shontos, 328 F.3d at 427. Further, the non-examining opinion does not comport with the opinion of Dr. Johnson, who performed a 30 minute psychological examination and assessed major depressive disorder and a GAF of 50, indicating serious symptoms.

While the undersigned notes the scant medical evidence presented by the Plaintiff and questions whether Plaintiff is disabled, the ALJ has the responsibility to support the RFC determination with medical evidence that addresses the Plaintiff's ability to function in the workplace. To the extent that the record is insufficient, the ALJ should re-contact the examining physicians or order further consultative examinations that specifically address Plaintiff's RFC.

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of March, 2014.